1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| SARA ELIZABETH SIEGLER and Sara Elizabeth Siegler, | CASE No. 3:18-cv-01681-GPC-NLS |

13

Plaintiffs,

**ORDER**

14

v.

15

SORRENTO THERAPEUTICS, INC.,
TNK THERAPEUTICS, INC., BDL
PRODUCTS, INC., CARGENIX
HOLDINGS LLC, TUFTS MEDICAL
CENTER, PROSPECT
CHARTERCARE ROGER WILLIAMS
MEDICAL CENTER LLC, HENRY JI,
RICHARD PAUL JUNGHANS,
STEVEN C. KATZ, and THE BOARD
OF DIRECTORS OF SORRENTO
THERAPEUTICS, INC.,

**(1) GRANTING THE SORRENTO
DEFENDANTS' MOTION TO
DISMISS [ECF NO. 18];**

16
17
18
19
20

**(2) GRANTING TUFTS
MEDICAL CENTER'S
MOTION TO DISMISS [ECF
NO. 19];**

**(3) GRANTING IN PART AND
DENYING IN PART
PLAINTIFF'S MOTION TO
FILE A SECOND AMENDED
COMPLAINT [ECF NO. 46.]**

21

Defendants.

22
23
24

Pending before the Court are three motions. The first is a motion to dismiss

25

Plaintiff's First Amended Complaint ("FAC"), filed by defendants BDL Products,

26

Inc., Cargenix Holdings LLC, Henry Ji, Sorrento Therapeutics, Inc., TNK

27

Therapeutics, Inc. (hereinafter, the "Sorrento Defendants"), on September 26, 2018.

28

(ECF No. 18.) This motion has been fully briefed (ECF Nos. 68, 70) and joined by

a number of defendants. (ECF Nos. 19, 20, 22, 24, 28, 57.) The second is a motion to dismiss for lack of jurisdiction, filed by defendant Tufts Medical Center, dated September 26, 2018. (ECF No. 19.) This motion has similarly received the benefit of full briefing. (*See* ECF Nos. 69, 71.) The third and final motion is pro se Plaintiff Sara Elizabeth Siegler's[1] ("Plaintiff's") motion for leave to file a second amended complaint, which was submitted in conjunction with Plaintiff's Omnibus Motion on October 11, 2018. (ECF No. 46, at 15.) This motion has been opposed by the Sorrento Defendants. (ECF No. 58.)

Pursuant to Civil Local Rule 7.1(d)(1), the Court finds the matter suitable for adjudication without oral argument. For the reasons set forth below, the Court **GRANTS** both motions to dismiss and **GRANTS in part** and **DENIES in part** Plaintiff's motion for leave to file a second amended complaint.

## I. Background

### A. Factual Background[2]

---

[1] Plaintiff has attempted to prosecute this action both as herself and as her sole proprietorship—i.e., as a Woman Owned Small Business registered in Ohio and with the Small Business Association—which she operates in her own name, and which is referred to as "SES" throughout her pleadings. However, under Ohio law, "[a] sole proprietorship has no legal identity separate from that of the individual who owns it," and "[t]he individual who does business as a sole proprietor under one or several names remains one person" for the purposes of civil suits. *Patterson v. V & M Auto Body*, 63 Ohio St. 3d 573, 575 (1992). Thus, there is only one plaintiff in this action, and that is Sara Elizabeth Siegler.

[2] Because this case comes before the Court upon two motions to dismiss, the Court recites the facts as stated in the Plaintiff's First Amended Complaint ("FAC"). Plaintiff has requested judicial notice of several links to the Securities and Exchange Commission's website, and of a case stated in the District Court of New Jersey involving claims against a number of defendants named in this case. (*See* ECF No. 68, at 16, 17.)

Both requests are denied. Although there is no rule against taking judicial notice of matters of public record, the Court does not deem reference to any of the SEC materials necessary at this juncture. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (taking notice of reported stock history and other publicly available financial documents, including a number of SEC filings"). In any event, the Court can, at most, take judicial notice of "the content of the SEC Forms [] and the fact that they were filed with the

- 2 -

CASE NO. 18-CV-01681-GPC-BGS

## 1. Introduction

Plaintiff Sara Siegler is a resident of Ohio. Plaintiff established an Ohio-based sole-proprietorship in her own name in April of 2011. Plaintiff's sole-proprietorship is alleged to be "an early stage micro-entity without any marketed pharmaceutical products to date." (ECF No. 3, at 46.) Plaintiff asserts that she is a "potential participant in the CAR T cell pharmaceutical market both domestically and abroad." (*Id.*)

Plaintiff began corresponding with defendant Richard Junghans ("Dr. Junghans") in 2013. Thereafter, Plaintiff began to work on a planned collaboration with Dr. Junghans to develop new chimeric antigen receptor ("CAR") T cell-based therapeutics for virology and oncology indications invented by Dr. Junghans. According to Plaintiff, Dr. Junghans previously filed patent application No. 10/006,711 in 2002 for a "second generation CAR T cell construct with a humanized single chain variable fragment . . . binding domain targeting the carcinoembryonic antigen ("CEA") on tumor cells," but had abandoned that application as of February 17, 2006. (ECF No. 3, at 4, 95.)

At some point before August 2015, Plaintiff created two "work products" as part of the aforementioned collaboration with Dr. Junghans. (*Id.* at 4.) Those work

---

agency. The truth of the content, and *the inferences properly drawn from them,* however, is not a proper subject of judicial notice under Rule 201." *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008) (emphasis added).

The request for notice of the New Jersey litigation is denied because Plaintiff purports to rely on the denial of the motions to dismiss in *that case* as argument for why she should survive the motions to dismiss in *this case*. Moreover, Plaintiff invokes pleadings and allegations from the New Jersey litigation as matters of truth. (*See, e.g.*, ECF No. 68, at 26 n.16.) As stated by another judge of this judicial district, "[d]ocuments that are part of the public record may be judicially noticed to show, for example, that a judicial proceeding occurred or that a document was filed in another court case, but a court may not take judicial notice of findings of fact from another case." *Walker v. Woodford*, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006). "Nor may the court take judicial notice of any matter that is in dispute." *Id.* Accordingly, the Court cannot take judicial notice of the New Jersey litigation for the purposes requested by Plaintiff.

CASE NO. 18-CV-01681-GPC-BGS

products encompass two text-based scientific articles which were registered for copyrights with the United States Copyright Office, with registrations effective September 8, 2015. (ECF No. 3, at 85, 91.) They include a work entitled "In Vivo Testing of 3rd Generation Anti-CEA Designer CAR T Cells with Bcl-xL in Pancreatic Cancer," registered as TXu 1-998-310 (the "'310 Copyright") and a work entitled "Phase 1b/2 Study of [2nd Generation] Anti-CEA Designer CAR T Cells in Breast Cancer," registered as TXu 1-998-311 (the "'311 Copyright"). (*Id.*) To develop her research, Plaintiff made plans to utilize the current Good Manufacturing Practice ("cGMP") facility at defendant Prospect Chartercare Roger Williams Medical Center LLC ("RWMC"), a for-profit medical institution registered in Rhode Island.

### 2. Dr. Junghans's Involvement with BDL and SRNE

In May of 2014, after Plaintiff's initial contact with Dr. Junghans, Dr. Junghans became employed on a part-time basis with Tufts Medical Center, a not-for-profit medical institution with its principal place of business in Massachusetts. (*Id*., at 11.) Dr. Junghans was initially employed as an Investigator in the Department of Medicine, Division of Hematology and Oncology, and later served as a member of the Special and Scientific Staff. (ECF No. 19-2 (Decl. of Susan Blanchard, dated Sept. 26, 2018).)

Thereafter, on or about July 16, 2015, Dr. Junghans registered in Massachusetts a company—defendant BDL Products, Inc. ("BDL")—which Plaintiff alleges was created for the sole purpose of facilitating Dr. Junghans's theft of Plaintiff's intellectual property. (ECF No. 3, at 5.) According to Plaintiff, Dr. Junghan passed off her work as his own, and violated her right to first refusal on other CAR T cell constructs for which Plaintiff had not yet registered copyrights, including the "anti-c-KIT CAR, the anti-GD3 CAR, the anti-PSMA CAR, and the anti-IL13Rα2 CAR." (*Id.*) After its establishment, BDL was acquired by

Defendant Sorrento Therapeutics, Inc. ("SRNE"), via its wholly-owned subsidiary, TNK Therapeutics, Inc. ("TNK"), both which have California as their principal place of business. (*Id.*) Henry Ji, the Chairman, President, and CEO of SRNE, and SRNE's Board of Directors, have both been named as defendants in this suit.

### 3. The Stock Purchase Agreement (SPA), the Membership Interest Purchase Agreement (MIPA), and the Sponsored Research Agreements (SRA)

On August 7, 2015, Dr. Junghans and BDL executed a Stock Purchase Agreement ("SPA") with TNK. The SPA was allegedly contingent upon the closing of a Membership Interest Purchase Agreement ("MPA") between TNK and CARgenix Holdings LLC ("Cargenix"), a Rhode Island corporation that has as one of its equity owners defendant Steven C. Katz ("Dr. Katz"). (*Id.* at 6, 11.) The MPA includes a section titled "Execution of Exclusive License Agreements," which provides for the exclusive licensing of the "IL13 CAR, the c-KIT CAR, and the HIV CAR." (*Id.* at 20.) According to Plaintiff, also in either the MPA or the SPA was a "restrictive covenant" provision that prohibited Dr. Junghans and his affiliated research institution, i.e., Tufts Medical Center, from working with her as part of the originally-planned collaboration. (*Id.*) It is further alleged that SRNE and TNK enticed Dr. Junghans to misappropriate and infringe Plaintiff's intellectual property in exchange for a $6,000,000 stock payment as part of the SPA. (*Id.* at 16.)

Plaintiff became privy to the SPA and MPA in August of 2015. Around August 24, 2015, she received email correspondence from Susan Blanchard, Vice President for Research Administration at Tufts Medical Center. The email exchange apparently signaled to Plaintiff that her planned collaboration with Dr. Junghans was in potential peril. (*Id.* at 17.) A few days later, on August 27, 2015, Dr. Junghans sent Plaintiff an email advising that "i/tufts can not help a competitor"

and "i/tufts can continue to do my own 'research' including collaborations." (*Id.*) Plaintiff believes that the contents of those emails derive from the restrictive covenants found in either the MPA or the SPA. Communications between Dr. Junghans and Plaintiff about further collaborations were unsuccessful, and Plaintiff ultimately terminated her relationship with Dr. Junghans after discovering that it was Dr. Junghans' company, i.e., BDL, which had precipitated the restrictive covenant in the first place. (*Id.* at 18.)

### 4. Alleged Wrongful Actions by Defendants

Plaintiff asserts that the SPA, MIPA, and SRA catalyzed a number of wrongful actions by the defendants in this case. According to Plaintiff, those actions sounded in copyright infringement, anticompetitive and monopolizing behavior, and unfair business practices.

Broadly speaking, Plaintiff asserts that defendants improperly seized upon her intellectual property by performing experimental trials similar to the ones she described in her copyrights, and by attempting to secure patents for constructs she researched therein. She maintains that defendants improperly incorporated her intellectual property into corporate presentations, conspired to exclude her from the anti-CEA CAR T cell market, and engaged in a number of business dealings with other entities to commercialize her copyrights both domestically and abroad. Plaintiff further alleges that she has been excluded from conducting investigational activities at RWMC.

### a. Exclusion from RWMC's cGMP Facility

In April 2016, SRNE and TNK entered into an Immunotherapy Research Collaboration Agreement ("IRCA") with RWMC, whose cGMP facility Plaintiff had hoped to utilize. Although it is not entirely clear based on Plaintiff's pleadings whether the IRCA contained an exclusivity clause, Plaintiff indicates that as a result

of the IRCA, she was effectively precluded from using the cGMP facility. As a consequence, Plaintiff avers that she is bereft of a "cGMP facility to manufacture clinical grade investigational products for use in the pre-approval phases of the product development lifecycle." (*Id.* at 21.) Later, in January of 2018, the initial IRCA was extended. That extension unambiguously contained an "exclusive agreement to operate the 'Cellular Immunotherapy and Gene Therapy Facility' at Roger Williams Medical Care Center . . . under Sorrento management." (*Id.* at 22.)

### b. The HITM-SURE Trial

On July 14, 2016, a clinical trial referred to as "HITM-SURE" was registered to clinicaltrials.gov with a National Library of Medicine identifier NCT02850536. The HITM-SURE trial lists RWMC as its sponsor, and is a study of a U.S. Food and Drug Administration ("FDA") regulated product—i.e., CAR T cells. SRNE has apparently incorporated information about the HITM-SURE trial into its corporate presentations as of April, 2018. (*Id.* at 29.) According to Plaintiff, the HITM-SURE trial, which is premised on a Phase 1b trial of 2nd Generation Anti-CEA Designer CAR T Cells in Liver Metastases or Pancreatic Cancer, is a "substantially similar Phase 1b clinical trial" which infringes on both the '311 Copyright (describing a Phase 1b/2 study of CAR T Cells in Breast Cancer) and the '310 Copyright (describing testing of 3rd generation CAR T cells in Pancreatic Cancer). (*Id.* at 28.)

### c. The T-001 Investigational New Drug

Starting in August 2015, SRNE announced through a number of corporate presentation slides its plan to develop an investigational new drug ("IND") denoted as T-001. (*Id.* at 30–31.) Plaintiff's quarrel with the T-001 IND is not clearly pleaded, but it appears that Plaintiff believes that the restrictive covenant in the SPA/MIPA foreclosed her from working with Dr. Junghans on its development. As

CASE NO. 18-CV-01681-GPC-BGS

a consequence of her exclusion on the T-001 IND project, Plaintiff claims she will be unlikely to obtain a Letter of Authorization to achieve an IND of her own.

### d. The '818 and '370 Patent Applications by RWMC

After Plaintiff registered her copyrights, RWMC filed patent application No. 15/210,818 (the "'818 application"), which listed Dr. Junghans and Dr. Katz as inventors. (*Id.* at 22–23.) According to Plaintiff, this patent application was flawed in a number of ways: (1) it should have been precluded by Dr. Junghans's previously filed and abandoned patent—i.e., the one docketed as No. 10/006,711; (2) it neglected to mention a number of earlier trials conducted by Dr. Junghans; and (3) it was obvious in light of her copyrights and constituted copyright infringement. (*Id.* at 23–24.) While the '818 application was pending, Plaintiff directed her concerns to the United States Patent and Trademark Office ("US PTO"). On June 25, 2018, the US PTO responded to Plaintiff in a letter advising her that the time for filing either a Third Party Submission or a Protest had passed. (*Id.* at 96–97.) The '818 application was approved by the US PTO on September 11, 2018, after Plaintiff's operative complaint was filed. (ECF No. 46, at 16.)

RWMC also sought registration of the 2nd generation, retrovirally transduced anti-CEA CAR T cell construct that Plaintiff claims was the subject of her '311 Copyright. This resulted in patent application No. 15/099,370 (the "'370 application"), the validity of which Plaintiff contests on grounds previously enumerated with respect to the '818 application. Unlike RWMC's '818 application, the '370 application has not received US PTO approval and was the subject of a Final Rejection letter dated July 2, 2018. (*Id.* at 27.)

### e. Tufts Medical Center's Provisional Patent Application and its Contractual Relationships with SRNE

In addition to the two patent applications filed by RWMC, Plaintiff alleges copyright infringement by Tufts Medical Center. (*Id.* at 32–33.) Tufts Medical Center filed a provisional patent application with the US PTO entitled "Compositions and Methods for Improving Immune Cell Function," docketed as application No. 62/362,825 (the "'825 priority data"). The '825 priority data is alleged to encompass 2nd generation anti-CEA CAR T cells with YY1 or EZH2 inhibition.

Plaintiff surmises that the '825 priority data may have arisen out of work performed by Dr. Junghans as part of two agreements between Tufts Medical Center and SRNE. On March 14, 2016, Tufts Medical Center executed a Sponsored Research Agreement ("SRA") with SRNE. (*Id.* at 19.) Under the terms of the SRA, SRNE awarded Tufts Medical Center $161,700 in laboratory funding for "discrete research to be conducted by Dr. Junghans at Tufts Medical Center in Boston, Massachusetts." (ECF No. 19-2, at 5.) One year later, on January 27, 2017, Tufts Medical Center executed a second SRA with SRNE, termed the "Letter Agreement," valued at $129,000 in laboratory funding. (*Id.*)

### f. Business dealings with 3SBio, Celularity, and Virttu Biologics

Plaintiff also takes umbrage with a number of SRNE and TNK's business dealings. Specifically, Plaintiff alleges that SRNE entered into a joint-venture agreement with Shenyang Sunshine Pharmaceutical Company Ltd. ("3SBio") in June of 2016 to commercialize and develop the anti-CEA CAR T constructs inherent in her copyrights. (*Id.* at 33.) As part of this joint venture, SRNE is alleged to have illegally granted to 3SBio an exclusive license to market the anti-CEA CAR T cell in the "Greater China market," a market which encompasses "Mainland China, Hong Kong, and Macau." (*Id.* at 34.)

Plaintiff also objects to TNK's contractual relationship with Celularity. Plaintiff believes that TNK licensed a number of CAR T constructs to Celularity involving her copyrights. (*Id.* at 34–35.) Although the constructs subject to the TNK/Celularity License and Transfer Agreement were redacted in SEC filings, Plaintiff alleges on information and belief that some of the 53 constructs implicated are likely to contain her intellectual property.

Finally, Plaintiff challenges TNK's acquisition of Virttu Biologics ("Virttu"), a Scottish company. (*Id.* at 37.) Plaintiff avers that TNK executed a binding term sheet to acquire Virttu to research, develop, and ultimately commercialize a CAR T cell and oncolytic virus combination based therapeutic. This was problematic for Plaintiff because the anticipated commercialization of CAR T cells by Virttu would implement, or be derivative of, "research plan documents" incorporated within Plaintiff's copyrights, which provided "alternative strategies . . . outlining methods to improve the efficacy and/or safety of the investigational anti-CEA CAR T cell products." (*Id.* at 37.) Plaintiff fears that Virttu will use alternative vectors, co-stimulatory signals, and different tumor associated antigens, and in effect implement the alternative strategies she detailed in the '311 Copyright.

### 5. Injuries Alleged

Plaintiff urges that the anti-competitive and anti-trust business practices of SRNE and its wholly-owned subsidiary, TNK, upended her planned collaboration with Dr. Junghans, Tufts Medical Center, and RWMC, resulting in a loss of income. Although she states that the CAR T cell goods market for solid tumors "does not yet exist," (ECF No. 3, at 63), Plaintiff fears that that the setbacks dealt by defendants have stymied her ability to reach key authorization milestones, such that SRNE and TNK might "enjoy first to market status in the event of approval for marketing by the US FDA." (*Id.* at 48.)

## B. Procedural Background

Plaintiff filed her original complaint on July 24, 2018, which was amended on August 20, 2018 as the First Amended Complaint ("FAC"). (*See* ECF No 3.) Plaintiff's FAC raises a number of claims: for copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.* (Claims for Relief I, III, and IV), for misappropriation of trade secrets under California's Uniform Trade Secrets Act ("CUTSA"), CAL. CODE CIV. PROC. §§ 3425 *et seq.*, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (Claims for Relief II and V); for anti-trust violations under the Sherman and Clayton Acts, 15 U.S.C. §§ 1-7, 12-27 (Claim for Relief VII through XII); for a violation of the Fifth Amendment's Taking Clause (Claim for Relief VI); and for a violation of California's Unfair Competition Law, CAL. BUS. CODE § 17200 (Claim for Relief XIII). Pursuant to those claims, Plaintiff seeks, *inter alia*, injunctive relief, treble damages, costs, and a declaration that the '818 patent is invalid.

On September 26, 2018, the Sorrento Defendants filed a motion to dismiss the FAC. (ECF No. 18.) That motion to dismiss challenged Plaintiff's allegations as defective under Rule 12(b)(6). That same day, Tufts Medical Center filed a motion to dismiss premised on Rule 12(b)(1). (ECF No. 19.) That motion argued that the Court lacked personal jurisdiction because Tufts Medical Center, as a Massachusetts entity, was neither at home in California, nor subject to suit there as a matter of specific jurisdiction.

On October 11, 2018, Plaintiff sought leave to amend her FAC by way of an Omnibus Motion. (ECF No. 46.) Two anticipated amendments are relevant to the matters at hand. First, Plaintiff sought to update her pleadings to reflect that the '818 application, which had previously been pending before the US PTO, had since been granted. (*Id.* at 16.) Second, Plaintiff identified another "potentially infringed document," that is, the "Hematology/Oncology Chiefs database created by SES."

(*Id.*)  Although the vast majority of the Omnibus Motion has been resolved by the Court prior to the issuance of this Order, the Court reserved ruling on the request for leave to file a second amended complaint so that it may address the defendants' motions and Plaintiff's plea for leave to amend simultaneously.

## II.    Motion to Dismiss under Rule 12(b)(6)

The Sorrento Defendants contend that all of Plaintiff's copyright allegations are bottomed on the legally untenable proposition that Plaintiff's copyrights on two scientific articles discussing the idea and science behind anti-CEA CAR T construct invalidate any attempt by others to implement, license, perform, utilize, or commercialize on the construct itself.  Defendants argue that because a copyright, unlike a patent, confers an exclusive right only to the *expression* of the idea, and not the idea itself, Plaintiff has no claim for copyright infringement.

The Sorrento Defendants further argue that Plaintiff's anti-trust claims must be cast aside wholesale because she has failed to plead the existence of a 'relevant market,' or an injury to competition, omissions fatal to her claims under the federal anti-trust statutes.  They further contend that the Board of Directors of SRNE is incapable of being sued as such, and that no Fifth Amendment claim may lie against private entities given the allegations in this case.

### A. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."  *Balisteri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  While

a plaintiff need not give "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." *Id.* at 545. "[F]or a complaint to survive a motion to dismiss, the non–conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). Legal conclusions, however, need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003). Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Mktg. Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998).

In addition, courts "liberally construe[]" documents filed pro se, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), affording pro se plaintiffs benefit of the doubt. *Thompson*, 295 F.3d at 895; *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Davis v. Silva*, 511 F.3d 1005, 1009 n.4 (9th Cir. 2008) ("[T]he Court has held pro se pleadings to a less stringent standard than briefs by counsel and reads pro se pleadings generously, 'however inartfully pleaded.'"). Pro se litigants "must be ensured meaningful access to the courts." *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc). In giving liberal interpretation to a pro se complaint, the court is not permitted to "supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). Nor does a litigant's pro se status excuse her from complying

with the substantive rules of the court. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *Jackson v. Carey*, 353 F.3d 750, 757 (9th Cir. 2003). As with pleadings drafted by lawyers, a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *W. Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). With these standards in mind, the Court turns to the challenges raised by the Sorrento Defendants.

## B. Copyright Infringement Allegations

To state a claim for copyright infringement, Plaintiff must establish two elements: "(1) ownership of the copyright; and (2) infringement – that the defendant copied protected elements of the plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000); *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991). Establishing the second element requires a showing of "two distinct components: 'copying' and 'unlawful appropriation.'" *Renstmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018). In addition, to infringe, "the defendant must also copy enough of the plaintiff's expression of those ideas or concepts to render the two works 'substantially similar.'" *Id.* (citing *Mattel, Inc. v. MGA Entertainment, Inc.*, 616 F.3d 904, 913–14 (9th Cir. 2010)).

Defendants do not challenge Plaintiff's ownership of the '311 and '310 Copyrights.[3] They dispute only Plaintiff's failure to allege unlawful appropriation.

As stated by the Ninth Circuit in *Renstmeester*, "[p]roof of unlawful appropriation—that is, illicit copying—is necessary because copyright law does not forbid all copying." *Id.* Section 102 of the Copyright Act, which "sets forth the proper subjects of copyright protection," *Bikram's Yoga College of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032, 1036 (9th Cir. 2015), expressly provides that copyright protection does not "extend to any idea, procedure, process, system,

---

[3] Interestingly, Plaintiff's response brief advises that her copyrights were works made for hire, and work products of her planned collaboration with Dr. Junghans. (*See* ECF No. 68, at 18.)

CASE NO. 18-CV-01681-GPC-BGS

method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in [the copyrighted] work." 17 U.S.C. § 102(b). Section 102(b) codifies the "idea/expression dichotomy," under which "'every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication'; the author's expression alone gains copyright protection." *Golan v. Holder*, 565 U.S. 302, 328 (2012) (quoting *Eldred v. Ashcroft*, 537 U.S. 187, 209 (2003)).

As the Supreme Court explained in *Baker v. Selden*, 101 U.S. 99 (1879), any person who seeks to obtain an exclusive right to an idea, process, or method, (or system of bookkeeping, as it were in that case), must apply themselves to the patent authorities, and not to the copyright regime:

> The description of the art in a book, though entitled to the benefit of copyright, lays no foundation for an exclusive claim to the art itself. The object of the one is explanation; the object of the other is use. The former may be secured by copyright. The latter can only be secured, if it can be secured at all, by letters-patent.

*Id.* at 105. "[R]ecognizing this vital distinction between ideas and expression, courts have routinely held that the copyright for a work describing how to perform a process does not extend to the process itself," and held against plaintiffs on that basis. *Bikram's Yoga*, 803 F.3d at 1037–38 (holding that a "system" of yoga poses and breathing exercises described in copyrighted books were not copyrightable in and of themselves and affirming summary judgment in favor of defendant who incorporated the poses and exercises in their yoga class offerings); *see e.g.*, *Rosado v. Roman*, 16-CV-784-SI, 2017 WL 3473177, at *3 (D. Or. Aug. 11, 2017) (granting motion to dismiss because plaintiff's copyrights to technical drawings of water pipes did not confer on the plaintiff "the exclusive right to manufacture from his technical drawings").

Because ideas may not be copyrighted, there is no unlawful appropriation, and

"a defendant incurs no liability[,] if he copies only the 'ideas' or 'concepts' used in the plaintiff's work." *Rentmeester*, 883 F.3d at 1117. This rule makes ample sense because "the primary objective of copyright is not to reward the labor of authors, but to '[p]romote the Progress of Science and the Useful Arts.'" *Feist*, 499 U.S. at 349 (quoting U.S. Const. art. I, § 8, cl. 8). Indeed, inherent in the design of copyright law is a solicitude for "[t]he public's interest in the broad diffusion of scientific knowledge." *Elsevier Inc. v. www.Sci-Hub.org*, No. 15 CIV. 4282 RWS, 2015 WL 6657363, at *5 (S.D.N.Y. Oct. 30, 2015).

Here, Plaintiff has failed to state a claim of unlawful appropriation because she has only alleged an infringement upon the non-copyrightable aspects of her work.

Plaintiff does not clearly articulate the nature of her copyrights. She has not provided a copy of the copyrighted material, either under seal or otherwise. (*See* ECF No. 3, at 4–5, describing the '310 and '311 Copyrights only as "work products".) But construing her pleadings liberally, and by relying on scattered descriptions of those works, it is apparent to the Court that her copyrights were secured for two scientific articles which describe a Phase 1/b2 clinical trial and provide a research agenda to improve anti-CEA Car T cell products.[4] Under the "idea/expression dichotomy" articulated in *Baker* and emphasized *Golan*, the scope of Plaintiff's copyright necessarily extends only to the expression of her ideas. *See also Mazer v. Stein*, 347 U.S. 201, 217 (1954) ("Unlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself.") The actual science, theories, facts, and processes inherent in

---

[4] Plaintiff describes elsewhere in her filings that her "copyrighted works . . . cover a Phase 1b/2 clinical trial as well as *in vivo* research that occurs prior to, and may be required for, the initiation of a clinical trial to test an investigational agent on human research participants." (ECF No. 68, at 23.) And her FAC makes reference to the fact that both copyrights contain "research plan documents that included an alternative strategies section outlining methods to improve the efficacy and/or safety of the investigational anti-CEA CAR T cell products." (ECF No. 3, at 36.)

Plaintiff's works were not made exclusively hers by operation of copyright. *Id.*

The nature of Plaintiff's pleadings demonstrate that she is seeking to protect the ideas and scientific processes (i.e., non-copyrightable aspects) of her works. Plaintiff never explains in her FAC how she believes the '818 and '370 applications infringe on her work. (ECF No. 3, at 22–27.) She alleges only that Dr. Junghans failed to disclose "IP of SES" in the applicable disclosure statements and that the applications "are obvious over the IP of SES." (*Id.* at 25.) Even construing her pleadings in the light most favorable to Plaintiff, *Davis*, 511 F.3d at 1009 n.4, what emerges is an allegation that Dr. Junghans implemented and relied on her research and theories of the anti-CEA Car T cell construct with respect to the '818 and '370 applications. But as explained previously, ideas and processes are not in themselves copyrightable and cannot give rise to claims of infringement. *See, e.g.*, *Elsevier Inc.*, 2015 WL 6657363, at *5 ("[T]he 'idea/expression dichotomy' ensures that while a scientific article may be subject to copyright, the ideas and insights within that article are not.").[5] Allegations that Tufts Medical Center somehow infringed on her copyrighted works by filing the patent application for the '825 priority data is therefore similarly unavailing.

Plaintiff also alleged infringement with respect to the defendants' HITM-SURE trial, their promotion of the T-001 Investigation New Drug, SRNE's joint

---

[5] Plaintiff might have articulated a claim of unlawful appropriation by contending that Defendants copied the copyrightable *expression* of her ideas. *See, e.g., Univ. Colo. Found. Inc. v. American Cyanamid*, 880 F. Supp. 1387, 1400 (D. Colo. 1995) *on reconsideration in part*, 902 F. Supp. 221 (D. Colo. 1995), *vacated sub nom. Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366 (Fed. Cir. 1999), and *aff'd in part, vacated in part on other grounds sub nom. Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366 (Fed. Cir. 1999) (finding the depiction of figures and charts in a medical journal article to be protectable expressions, and that the defendant's copying and pasting those protected elements into a patent application amounted to copyright infringement). But without alleging what if any part of her copyrighted works were protected subject matter, the Court is unable to supply this critical element for her, and manufacture the requisite pleadings on her behalf. *See Ivey*, 673 F.2d at 268 (even giving a liberal interpretation of a pro se complaint, courts "may not supply essential elements of the claim that were not initially pled").

venture with 3SBio in China, TNK's contractual agreements with Celularity, and the acquisition of Virttu Biologics by SRNE. Again, the precise contours of any asserted infringement is not explained in the FAC. However, based on Plaintiff's description of the defendants' wrongful conduct, it is apparent that Plaintiff's quarrel with these actions is once again borne out of a concern for the non-copyrightable aspects of her work.

Plaintiff takes issue with the HITM-SURE trial for implementing a "substantially similar Phase 1b clinical trial utilizing the 2nd generation anti-CEA CAR T cells" described in her copyrighted works. (ECF No. 3, at 28.) She objects to the T-001 IND, the joint venture with 3SBio, the Celularity contracts, and the acquisition of Virttu Biologics, ostensibly because those endeavors all seek to implement the research and discoveries Plaintiff claims to have made in her copyrighted works. But just as "the copyright for a book describing how to perform a complicated surgery does not give the holder the exclusive right to perform the surgery," neither does a copyright for scientific articles describing how to perform trials involving anti-CEA CAR T cell constructs convey upon the copyright holder the exclusive right to perform such trials or to profit off of them. *Bikram's Yoga*, 803 F.3d at 1039.

"In order to enjoy a lawful monopoly over the idea or functional principle underlying a work, the creator of the work must satisfy the more stringent standard imposed by the patent laws." *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526 (9th Cir. 1992), *as amended* (Jan. 6, 1993). Since Plaintiff has no patent over the subject matter of her copyrighted works, Plaintiff cannot seek to preclude others from making use of the concepts inherent therein.[6]

---

[6] Plaintiff alleges in her response brief that defendants have "performed" and "displayed publicly" her work, and asserts in the alternative that Defendants' use of her work in connection with the HITM-SURE trial made the HITM-SURE trial a derivate work. (ECF No. 68, at 16–18.) But the means by which the alleged act of infringement happens—i.e., whether it is through

CASE NO. 18-CV-01681-GPC-BGS

The copyright infringement claims **are hereby dismissed** *without prejudice*. Plaintiff has sought leave to amend her FAC to include allegations about another "potentially infringed document," identified as a "Hematology/Oncology Chiefs database created by SES." (ECF No. 46, at 16.) She is accordingly granted leave to respond to the deficiencies noted above and to incorporate into her pleadings any contentions arising out of the Hematology/Oncology Chiefs database. Plaintiff is advised to specifically to identify what *protectable* elements of her copyrighted works were copied unlawfully by defendants.

### C. Trade Secret Claims

Plaintiff has raised two claims (i.e., Claims for Relief II, and V) under California's Uniform Trade Secrets Act ("CUTSA") and the Defend Trade Secrets Act ("DTSA").

Both statutes are aimed at shielding trade secrets from misappropriation, with the distinction that any claim arising under the DTSA must have a connection to interstate or foreign commerce. *See* 18 U.S.C. § 1836(b)(1) (providing that the "owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce"). To state a claim under either statute,[7] a plaintiff must prove: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *CytoDyn of New Mexico, Inc. v. Amerimmune Pharm., Inc.*,

---

performance or a derivative work—is of no relevance unless Plaintiff can establish that Defendants had unlawfully infringed on a protectable element of her copyrighted works.

[7] Courts have consistently recognized that the elements of a DTSA claim are substantially similar to claims under CUTSA. *See, e.g., Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018); *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017) (stating that "the California Uniform Trade Secrets Act and the federal Defend Trade Secrets Act . . . offer essentially the same definitions for our purposes").

CASE NO. 18-CV-01681-GPC-BGS

160 Cal. App. 4th 288, 297 (2008) (quoting *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003)).

Plaintiff's DTSA and CUTSA claims fail as a matter of law because she has not adequately alleged that she in fact owned a trade secret. As the party asserting a misappropriation of trade secrets, Plaintiff "must identify the trade secrets and carr[ies] the burden of showing that they exist." *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 522 (9th Cir. 2993). A trade secret is information that "(1) [d]erives independent economic value . . . from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." CAL. CIV. CODE. § 3426.1(d). Plaintiff's failure to plead the existence of trade secrets is two-fold.

First, Plaintiff "has set out [her] purported trade secrets in broad categorical terms," without specifying or "listing" out what "particular trade secrets [Plaintiff] has a basis to believe actually were misappropriated . . . ." *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018). Plaintiff does little more than assert the existence of her claimed trade secrets, arguing only that "the anti-CEA CAR T constructs [were] covered by . . . trade secrets." (ECF No. 3, at 41.) This is too conclusory an allegation to prove that Plaintiff did in fact possess trade secrets. *See Ileto, 349 F.3d at 1200* (on a Rule 12(b)(6) challenge, courts may not "assume the truth of legal conclusions cast in the form of factual allegations").

Second, and more fatally, what little Plaintiff alleged with respect to her trade secrets actually undermines any inference that they do in fact exist. The *sine qua non* of a trade secret is that it is valuable because it is unknown to others. "Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the trade secret protects his interest from

disclosure to others." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). Accordingly, "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Id.*

Courts have consistently denied the existence of a trade secret where, as here, the claimed trade secret is alleged to have been submitted without redaction for registration with the United States Copyright Office. *See KEMA, Inc. v. Koperwhats*, 658 F. Supp. 2d 1022, 1031 (N.D. Cal. 2009) (holding that defendant's counter-claim for trade secret misappropriation failed where defendant filed source code with the Copyright Office and failed to allege that his submission was redacted); *Mobile Active Defense, Inc. v. Los Angeles Unified Sch. Dist.*, No. 15-08762 RGK (GJSx), 2015 WL 12860491, at *5 (C.D. Cal. 2015) (denying a preliminary injunction pursuant to the CUTSA on the same grounds). This is because the act of registration necessarily requires some degree of public exposure.

In order to obtain registration, an applicant must submit one or two complete copies of the work to the Copyright Office. *See* 17 U.S.C. § 408(b); 37 C.F.R. § 202.20(c). Accordingly, Plaintiff must have submitted her claimed trade secrets to the Copyright Office, which submission was publicly accessible. Although the Copyright Office does place restrictions on requests for reproductions, 37 C.F.R. § 201.2(d)(2), the same restrictions do not apply to requests for inspection. *Compare* 17 U.S.C. § 705(b) ("[A]rticles deposited in connection with completed copyright registrations and retained under the control of the Copyright Office, shall be open to public inspection."); *with* 37 C.F.R. § 201.2(b)(1) (providing for public inspection at the Copyright Office of material deposited in connection with a completed copyright registration).

By registering both of her articles with the Copyright Office, and by neglecting to specify the particular trade secrets alleged to have been misappropriated, Plaintiff

has failed to allege that she possessed any trade secrets. Her claims under the CUTSA and the DTSA are accordingly dismissed. However, because it is not inconceivable that Plaintiff could clarify what if any trade secrets were misappropriated, and because she might able to furnish details about whether she redacted any of her submission to the Copyright Office, the **dismissal** of her copyright infringement claims **is granted with leave to amend.**

### D. Anti-Trust, Anti-Competition, and Unfair Trade Practices Claims

Plaintiff has raised a number of anti-trust, anti-competition, and unfair trade practice claims in the present action. Specifically, she has alleged: (1) constraints on trade and conspiracy to constrain trade under Section 1 of the Sherman Act (Claims for Relief VIII, IX, and XII); (2) attempted monopolization/conspiracy to monopolize under Section 2 of the Sherman Act (Claim for Relief X and XII); (3) exclusive dealings under Section 3 of the Clayton Act (Claim for Relief VII); (4) a violation of Section 14 of the Clayton Act (Claim for Relief XI); (5) a violation of the Foreign Trade Anti-Trust Improvement Act ("FTAIA"), 15 U.S.C. § 6 (Claim for Relief IX); and (6) unfair business practices under California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 (Claim for Relief XIII).[8]

By Plaintiff's account, the acquisition of BDL and CARgenix, the institution of the restrictive covenant in the SPA or MIPA, and her exclusion from the cGMP facility all present actionable claims under the Clayton and Sherman Acts because they implicate anticompetitive conduct within the anticipated United States market for anti-CEA CAR T cell constructs for solid tumors. Plaintiff has also alleged foreign anti-competitive injury arising out of SRNE's exclusive license to 3SBio to commercialize anti-CEA CAR T cells throughout the Greater China Market. Although the FTAIA generally excludes from the Sherman Act's reach much of the anticompetitive conduct that causes only foreign injury, Plaintiff appears to argue

---

[8] These claims will hereinafter be collectively referred to as the "anti-trust claims."

CASE NO. 18-CV-01681-GPC-BGS

that her claim falls within one of the exceptions to the general rule of the FTAIA, which permits Section 1 claims when the foreign harm alleged also involves conduct which "significantly harms imports, domestic commerce, or American exporters." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004).

Defendants contest the legal sufficiency of Plaintiffs pleadings, arguing, *inter alia*, that Plaintiff's anti-trust claims fail because she has not alleged an injury to competition or the existence of a relevant market.

### 1. Relevant Market

At the outset, the Court notes that each of Plaintiff's claims under Section 1[9] and 2 of the Sherman Act and Section 3 of the Clayton Act require her to establish market power in a "relevant market." *See*, *e.g.*, *Omega Environ. Inc., v. Gilbarco, Inc.*, 127 F.3d 1157, 1169 (9th Cir. 1997) (exclusive dealing); *Spectrum Sports, Inc. v. Mcquillan*, 506 U.S. 447, 456 (1993) (monopolization); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008) (restraints of trade).[10] That is, "Plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal*, 513 F.3d at 1044. "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. Univ. of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001) (citation omitted).

To be sure, Plaintiff is "not required to plead a relevant market with specificity." *Payment Logistics Ltd. v. Lighthouse Network, LLC*, No. 3:18-CV-00876-L-AGS, 2018 WL 5311907, at *2 (S.D. Cal. Oct. 23, 2018). However,

---

[9]     Plaintiff's claim under the FTAIA is in effect a claim that Section 1 applies to the anticompetitive conduct of the defendants in a foreign market.

[10]     In this case, the relevant-market inquiry does not differ in any material respects for Plaintiff's Clayton Act and Sherman Act claims. *See Newcal*, 513 F.3d at 1044 n.3 (standards the same under Sections 1 and 2 of the Sherman Act); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 23 n.39 (1984) (standards the same under Sherman Act Section 1 and Clayton Act Section 3). Therefore, "there is no need to distinguish or differentiate among [Plaintiff's] various claims; her market allegations are either sufficient or insufficient for all [her] claims." *Newcal*, 513 F.3d at 1044 n.3.

"[t]here are . . . some legal principles that govern the definition of an antitrust 'relevant market' and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal*, 513 F.3d at 1045. A facially-sustainable relevant market definition requires delineation of both a geographic and a product market. *See Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 183 F.3d 1096, 1104 (9th Cir. 1999). "A properly defined product market," in turn, "'includes a pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand.'" *Blizzard Entm't Inc. v. Ceiling Fan Software, LLC*, 941 F. Supp. 2d 1227, 1231 (C.D. Cal. 2013) (quoting *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988)).

Here, Plaintiff's anti-trust claims are facially unsustainable because she has failed to plead the existence of a relevant market altogether. *See Newcal*, 513 F.3d at 1044 ("Plaintiff must allege . . . that a 'relevant market' exists . . . ."). Plaintiff repeatedly identifies the relevant market as the "CAR T cell goods market for solid tumors, a goods market *which does not yet exist*." (ECF No. 3, at 63, 64) (emphasis added)). Indeed, she plainly acknowledges that her allegations pertain to Defendant's anti-competitive conduct in a "goods market that has yet to be established." (*Id.* at 66–67.) These allegations are fatal to her cause. If there is no extant product market, then it necessarily follows that there is no viable anti-trust claim. After all, allegations of monopolization, restraints on trade, and exclusive dealings all depend on a defendant's anti-competitive actions vis-à-vis an established, clearly-defined market. Indeed, "without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition." *Spectrum Sports*, 506 U.S. at 456 (quoting *Walker Process Equip. Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 177 (1965) (alterations omitted)).

## 2. Injury to Competition

Even assuming *arguendo* that Plaintiff alleged the existence of a relevant

market, Plaintiff's FAC is additionally deficient because Plaintiff has not adequately pleaded an injury to competition.

Under governing caselaw, an anti-trust plaintiff must allege an anti-trust injury. *Pool Water Prods. v. Olin*, 258 F.3d 1024, 1034 (2001). Anti-trust injury "mean[s] an 'injury of the type the antitrust laws were intended to prevent'—*i.e.*, an injury to competition. *Somers v. Apple, Inc.*, 729 F.3d 953, 967 (9th Cir. 2013) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Injury to competition requires allegations that *competition itself* has been injured, rather injury to specific competitors. *See Rutman Wine Co. v. E & J Gallo Winery*, 829 F.2d 729, 734 (9th Cir. 1987); *see also Les Shockley Racing, Inc. v. National Hot Rod Association*, 884 F.2d 504 (9th Cir. 1989) (holding that Sherman Act claimants must plead "a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market"); *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (unpublished) ("Mere injury to [the plaintiff] as a market competitor is not sufficient.")

Nothing in Plaintiff's FAC alleges an injury to competition in general. Instead, all of her allegations focus on the impact of defendants' anti-competitive conduct—as it relates to her. But even if Plaintiff, as a would-be competitor, was entirely excluded from the (allegedly non-existent) anti-CEA CAR T cell construct market, such an injury would not suffice to demonstrate an anti-trust injury. As the Ninth Circuit held in *Les Shockley Racing,* "removal of one or a few competitors need not equate with an injury to competition." 884 F.2d at 508 (9th Cir. 1989).

For the reasons stated, Plaintiff's claims under Section 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and the FTAIA, are **dismissed without prejudice**.[11]

---

[11] Because Plaintiff did not allege the existence of a relevant market or an antitrust injury, the Court need not address the Sorrento Defendants' alternative arguments that Plaintiff's failed to allege a specific intent to monopolize, as is required to state a claim under Section 2 of the

CASE NO. 18-CV-01681-GPC-BGS

### 3. Section 14 Clayton Act Claim

Plaintiff has also raised a claim under Section 14 of the Clayton Act, 15 U.S.C. § 24. Section 14 provides for the individual liability of the agents and directors of a corporation for any violation by the corporation of the *penal* provisions of the antitrust laws. *Id.* ("Whenever a corporation shall violate any penal provisions of the antitrust laws, such violation shall be deemed to be also that of the individual directors, officers, or agents of such corporation who shall have authorized, ordered, or done any of the acts constituting . . . such violation.")  This being a civil case, Section 14 is inapplicable.

However, construing broadly the pleadings of a pro se litigant, the Court will also address a potential claim against the individual directors, officers, or agents of the corporations named in the complaint, based on the civil wrongdoings of their corporate employers. Corporate officers, directors, and agents can be held personally liable for civil antitrust violations if they participate in those actions or authorize them. *See Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 851 (N.D. Cal. 1979). But, in order for personal liability to lie, the officers and directors at issue must have engaged in "inherently wrongful conduct." *Id.*; *see also GVF Cannery, Inc. v. California Tomato Growers Ass'n, Inc.*, 511 F. Supp. 711, 717 (N.D. Cal. 1981).

Here, there is no basis for personal liability for two reasons. First, the Court held *supra* that Plaintiff's complaint failed to state sufficient causes of action with respect to the anti-trust laws. This same conclusion applies to allegations against any individual directors, officers, or agents. Second, because Plaintiff has not alleged any "inherently wrongful conduct" by any individual director, officer, or agent, any claim for personal liability fails on that additional ground.

---

Sherman Act.  (*See* ECF No. 18-1, at 24–25.)  If Plaintiff avails herself of the opportunity to amend, she will likely have to clear this hurdle as well.

CASE NO. 18-CV-01681-GPC-BGS

Plaintiff's Section 14 claim is **dismissed with prejudice.**  However, Plaintiff will be permitted to amend her pleadings to state claims of personal liability against individual officers, directors, and agents, if such claims are premised upon the *civil* liabilities of their corporate employers.

### 4. Unfair Competition Law Claim

Plaintiff's unfair competition claim must also be dismissed.  California's unfair competition statute, Cal. Bus. & Prof. Code § 17200, proscribes conduct forbidden by other state and federal laws.  "Claims under this statute are thus entirely derivative."  *Maxim Integrated Prod., Inc. v. Analog Devices, Inc.*, No. C-92-20716 RPA (PVT), 1994 WL 514024, at *4 (N.D. Cal. Sept. 7, 1994), *aff'd in relevant part, rev'd in part on other grounds*, 79 F.3d 1153 (9th Cir. 1996).  "If the [predicate] claim is dismissed, . . . there is no 'unlawful' act upon which to base . . . the derivative Unfair Competition claim."  *Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (2005).  Conversely, if the underlying antitrust claim survives a Rule 12(b)(6) challenge, the corresponding unfair competition claim will persist as well.  *See N. California Minimally Invasive Cardiovascular Surgery, Inc. v. Northbay Healthcare Corp.*, No. C 15-06283 WHA, 2016 WL 1570015, at *6 (N.D. Cal. 19, 2016).

Here, because the only predicate conduct alleged in connection with Plaintiff's section 17200 claim involves the alleged anti-trust violations, Plaintiff's inability to establish the necessary predicate conduct also mandates the dismissal of her related unfair competition claim.  This **dismissal is also with leave to amend.**

### E. Suit against the Board of Directors of Sorrento Therapeutics, Inc.

Plaintiff has named as a defendant the Board of Directors of SRNE, a corporation incorporated in Delaware.  Defendants, relying on case law from various jurisdictions, object that no such suit can be sustained because the Board is not a separate entity from the corporation and lacks capacity to be sued.  *See Theta Chi*

*Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816, 821 (N.D. Cal. 2016) (holding under California law that a board of directors could not be sued because it was "not a separate legal entity that can be sued independently of the corporation itself"); *see also Lopez-Rosario v. Programa Seasonal Head Start/Early Head Start de la Diocesis de Mayaguez*, 245 F. Supp. 3d 360, 370 (D.P.R. 2017) (dismissing claims against the board of directors because it lacked capacity to be sued under Puerto Rico law). Plaintiff makes no direct response to this argument except to argue that Section 14 of the Clayton Act provides for the personal liability of corporate officers and directors.[12]

Pursuant to Rule 17 of the Federal Rules of Civil Procedure, an entity's capacity to be sued is governed "by the law under which it was organized." FED. R. CIV. P. 17(b)(2). Although Defendants have not cited any Delaware authorities describing whether a corporate board of directors has the capacity to be sued, the Court finds the reasoning articulated in Defendants' proffered cases persuasive and applicable to the situation at hand. It is well-known that "[t]he corporate entity does not exist separate from its board of directors, its officers and its stockholders," *Jules Inc. v. Boggs*, 165 W.Va. 510, 518 (W. Va. 1980), so a "suit against the board of directors is a suit against the corporation." *Lopez-Rosario*, 245 F. Supp. 3d at 370. There is no evidence in the record, and Plaintiff does not otherwise assert, that the Board of Directors of SRNE exists independent of the corporation. *See, e.g.*, *Team Sys. Int'l, LLC v. Haozous*, No. CIV-14-1018-D, 2015 WL 2131479, at *2 (W.D. Okla. May 7, 2015), *aff'd*, 656 F. App'x 907 (10th Cir. 2016) (dismissing claim against a board of directors where the plaintiff presented no legal authority that would permit such a suit under Oklahoma law). Accordingly, the Court will **dismiss the**

---

[12] This argument is unavailing because Section 14 provides for the personal liability of a corporation's "individual directors, officers, or agents." 15 U.S. § 24. It provides absolutely no authority for the proposition that a Board of Directors may be sued, under that section, or any other, for that matter.

**claims against the Board of Directors, with prejudice.**

### F. Declaratory Relief pursuant to the Declaratory Judgment Act

The Court next turns to Plaintiff's request for declaratory relief. At the time of filing of the FAC in August 2018, Plaintiff sought "a judgment from this Court invalidating the claims of the '818 application for which a patent is currently pending." (ECF No. 3, at 73.) According to Plaintiff, however, during the intervening time, the US PTO approved of and granted the previously-pending '818 application. (ECF No. 46, at 16.) As such, the Court addresses Plaintiff's request to declare invalid RWMC's '818 patent. The Court concludes that it does not have jurisdiction to rule on the request because there is no case or controversy at hand.

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "The phrase 'a case of actual controversy' in the Act refers to the types of 'cases' and 'controversies' that are justiciable under Article III of the Constitution." *Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*, 689 F.3d 1303, 1318 (Fed. Cir. 2012), *rev'd in part on other grounds by Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013). Thus, in a declaratory judgment case, if there is no case or controversy, there can be neither a claim for declaratory relief nor Article III subject matter jurisdiction. *See SanDisk Corp. v. ST Microelecs., Inc.,* 480 F.3d 1372, 1378 (Fed. Cir. 2007).

In *MedImmune, Inc. v. Genentech*, 549 U.S. 118 (2007), the Supreme Court examined—in the context of a patent license dispute—the Article III case or controversy requirement as it relates to the Declaratory Judgment Act. It explained that to show a case or controversy, the declaratory judgment plaintiff must prove that "'under all the circumstances, [the facts] show that there is a substantial controversy,

between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* at 127 (emphasis added). This controversy must be "'definite and concrete, touching the legal relations of parties having adverse legal interests,'" such that the dispute is "'real and substantial'" and "'admi[ts] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.*

Since *MedImmune*, the Federal Circuit has noted that an actual controversy requires "an injury in fact traceable to the patentee," which exists only if the plaintiff has alleged "both (1) an affirmative act by the patentee related to the enforcement of his patent rights and (2) meaningful preparation to conduct potentially infringing activity." *Association for Molecular Pathology*, 689 F.3d at 1318. Plaintiff, as the party seeking to establish jurisdiction, bears the burden of establishing both prongs of the jurisdictional requisites. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).

None of Plaintiff's pleadings are addressed towards the legal standards set out in *Molecular Pathology* or *MedImmune*. However, upon its review of the factual content of her pleadings, the Court concludes that Plaintiff's FAC does not carry her over the jurisdictional threshold. Plaintiff has not alleged an affirmative act by RWMC to enforce its patent rights against her, nor has she alleged any facts indicating that she has engaged in meaningful preparation to conduct potentially infringing activity.

The second prong of the analysis bears detailed explication. Plaintiff's FAC indicates that she has not undertaken any "meaningful preparation to engage in potentially infringing activity." *Association for Molecular Pathology*, 689 F.3d at 1318. Plaintiff admits that her sole proprietorship is but "an early stage micro-entity without any marketed pharmaceutical products to date." (ECF No. 3, at 46.).

CASE NO. 18-CV-01681-GPC-BGS

Plaintiff alleges that she achieved the "pre-pre investigation new drug" milestone with the FDA, that thereafter the FDA invited her to submit a proposal detailing a plan to replace or reduce animal testing as part of the FDA's pre-clinical program, and that she drafted a responsive proposal which is pending peer review and comment as of April 2018 (*Id.* at 46, 47.) Plaintiff further avers that she is in the process of "reaching milestones that are needed to *eventually gain entry* to the US market as well as other markets following marketing approval by the applicable regulatory bodies." (*Id.* (emphasis added)) The remoteness of Plaintiff's preparatory conduct renders her unable to demonstrate the immediacy required by Article III. "In general, the greater the length of time before potentially infringing activity is expected to occur, 'the more likely the case lacks the requisite immediacy.'" *Cat Tech. LLC v. TubeMaster, Inc.*, 528 F.3d 871, 881 (Fed. Cir. 2008) (quoting *Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1379 (Fed. Cir. 2004)).

Two cases from the Federal Circuit illustrate why Plaintiff's claim for declaratory relief must be dismissed for want of immediacy. In *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir. 2007), the Federal Circuit dismissed a declaratory judgment counterclaim asserted in 2005 where the party anticipated infringing activity to take place in "2010-2012, if ever," and where the current preparatory activities consisted of developing and submitting preliminary information to the FDA. *Id.* at 1346–50. In *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520 (Fed. Cir. 1992), that same court dismissed a defibrillator component manufacturer's claim for future patent infringement where accused product was in clinical trials and "years away" from potential FDA approval. *Id.* at 1527. Because Plaintiff's preparatory activities are at least as, if not more, attenuated the ones considered in *Benitec* and *Telectronics*, this Court must conclude that she presents no controversy "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127. Plaintiff's

declaratory judgment claim **shall be dismissed, with leave to amend.**

## G. Fifth Amendment Due Process / Takings Clause Claim

Plaintiffs have alleged that defendants have violated her Fifth Amendment due process rights. The Fifth Amendment, however, only applies to governmental actions, *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008), and defendants are private entities and individuals. Therefore, the Sorrento Defendants argue, the FAC fails to state a claim against them. The Court agrees with Sorrento Defendants.

"The United States Constitution protects individual rights only from *government* action, not from *private* action." *Single Moms, Inc. v. Montana Power Co.*, 331 F.3d 743, 746 (9th Cir. 2003). And, although it is not impossible for the Fifth Amendment to extend to private entities, those circumstances are rare. "In order to apply the proscriptions of the Fifth Amendment to private actors, there must exist a sufficiently close nexus between the (government) and the challenged action of the . . . (private) entity so that the action of the latter may be fairly treated as that of the (government) itself." *Rank v. Nimmo*, 677 F.2d 692, 701 (9th Cir. 1982) (internal quotations omitted). There are four different tests used to determine whether private action can be attributed to the state: "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus. Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).

Plaintiff has not attempted to fit her Fifth Amendment claim within the mold of any of the aforementioned tests.[13] And upon its review, it is apparent to the Court that none of them apply. First, it cannot be said that by developing and commercializing uses of the anti-CEA CAR T cell constructs, defendants took on a

---

[13] Plaintiff cites in her response brief the eminent domain case of *Kelo v. City of New London*, 545 U.S. 469 (2005), to argue that private property cannot be taken for public use without just compensation. The Court admits of that general principle but finds it entirely inapplicable to the present case. The defendant accused of violating the Fifth Amendment in *Kelo* was a municipality, i.e., a governmental actor, and not a private entity.

CASE NO. 18-CV-01681-GPC-BGS

governmental function that "is both traditionally and exclusively governmental," as is necessary to satisfy the first test. *Kirtley*, 326 F.3d at 1093. Nor does it appear to be the case that by issuing the disputed patents, "the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity." *Id.* Moreover, there has been no allegation of coercive influence or significant encouragement by the state. *Id.* at 1094. Finally, with respect to the final test, there is nothing alleged in the FAC that indicates that the defendants' "seemingly private behavior may be fairly treated as that of the State itself." *Id.* at 1094–95.

Plaintiff's Fifth Amendment claim is therefore dismissed. Because the Court finds further amendment would be futile, the **dismissal shall be with prejudice.**

### III. Motion to Dismiss for Lack of Personal Jurisdiction

In addition to its joinder of the Sorrento Defendants' motion to dismiss under Rule 12(b)(6), Tufts Medical Center has filed a motion to dismiss based on a lack of personal jurisdiction pursuant to Rule 12(b)(2).

Tufts Medical Center, a nonprofit corporation headquartered in Boston, Massachusetts and incorporated under Massachusetts law, argues that it has no connections to California and should not be summoned here to defend this lawsuit under constitutional due process principles. (ECF No. 19.) Specifically, Tufts Medical Center contends that the Court lacks both general and specific jurisdiction, and that Section 12 of the Clayton Act cannot support personal jurisdiction, either. In response, Plaintiff asserts that specific jurisdiction exists because Tufts Medical Center "had contact with California" as a result of its dealings with SRNE, which has its principal place of business in California. (ECF No. 69, at 10, 14.) In that regard, Plaintiff asserts that because Tufts Medical Center "received two sponsored research agreement payments from *California based* defendant Sorrento Therapeutics, Inc," (ECF No. 69, at 18.) Tufts Medical Center had the requisite minimum contacts with

the forum state.

Having reviewed the parties' pleadings, the Court concludes that Tufts Medical Center's motion must be granted.

### A. Legal Standard

In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss. *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010). The plaintiff cannot "simply rest on the bare allegations of its complaint," but uncontroverted allegations in the complaint must be taken as true. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).

Personal jurisdiction may either be authorized by federal statute or permissible to the extent provided under state law. With respect to the latter, "the district court applies the law of the state in which the court sits." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).

Under California law, courts may exercise jurisdiction "to the full extent that such exercise comports with due process." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017) (citing CAL. CIV. PROC. CODE § 410.10). As a result, "the jurisdictional analyses under state law and federal due process are the same." *Mavrix*, 647 F.3d at 1223. Due process "constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 517 U.S. 277, 283 (2014). Although a nonresident's physical presence within the territorial jurisdiction of the court is not required, the nonresident generally must have "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair

play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation marks and citation omitted). Minimum contacts come in two flavors: vis-à-vis general jurisdiction or specific jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

### B. Discussion

#### 1. General Jurisdiction

General jurisdiction is established when a party's "affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction imposes a high standard, requiring affiliations with a forum state that approximates physical presence. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415, (1984); *see also Schwarzenegger*, 374 F.3d at 801 (noting that general jurisdiction is an exacting standard because "a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world"). The paradigm forum for the exercise of general jurisdiction over a corporation is its "place of incorporation and principal place of business." *Daimler AG*, 571 U.S. at 137.

Here, Plaintiff has articulated no arguments in favor of general jurisdiction,[14]

---

[14] Plaintiff's opposition contains a heading titled "General Jurisdiction," under which she purports to demonstrate the existence of general jurisdiction. (ECF No. 69, at 13–17.) However, all of Plaintiff's arguments are geared towards diversity jurisdiction, an issue of subject matter jurisdiction which is conceptually distinct from whether personal jurisdiction exists. In this matter, Plaintiff has "confuse[d] the subject matter jurisdiction of the federal district court with its personal jurisdiction over particular defendants." *Allen v. Didion*, 846 F.2d 1382, 1988 WL 45374 (Table), at *2 (9th Cir. Apr. 27, 1988).

"The concepts of subject-matter and personal jurisdiction . . . serve different purposes, and these purposes affect the legal character of the two requirements." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). Subject matter jurisdiction deals with whether a district court has the authority to adjudicate a case based on whether it involves a federal question or there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000. *See* 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND Procedure § 1350 (3d ed. 2004). By contrast, personal jurisdiction concerns whether a controversy or party has sufficient contacts, ties, or relationships with the forum to

CASE NO. 18-CV-01681-GPC-BGS

and there can be no serious debate that the Court lacks such power over Tufts Medical Center.  As acknowledged by Plaintiff, Tufts Medical Center is incorporated in Massachusetts and has as its principal place of business its medical center located in Boston.  (ECF No. 69, at 15.)   There is no indication from the record that Tufts Medical Center has any affiliations with California that would render them at home there.   Although Plaintiff's burden of showing a prima facie basis for general jurisdiction is but slight, Plaintiff has failed to meet it nonetheless.  Even liberally construing Plaintiff's pleadings, the Court finds no basis for general jurisdiction.

## 2. Specific Jurisdiction

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'"  *Walden*, 571 U.S. at 283–84 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).

There are two principles undergirding the defendant-focused inquiry.  "First, the relationship between the nonresident defendant, the forum, and the litigation 'must arise out of contacts that the "defendant himself" creates with the forum State.'" *Axiom Foods,* 874 F.3d at 1068 (quoting *Walden*, 571 U.S. at 284). "Second, the minimum contacts analysis examines 'the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Id.* (quoting *Walden*, 571 U.S. at 285).

Three things must apply before the Court can exert specific jurisdiction: (1) the defendant either "purposefully direct[s]" its activities or "purposefully avails" itself of the benefits afforded by the forum's laws; (2) the plaintiff's claim "arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction [ ] comport[s] with fair play and substantial justice, i.e., it [is]

---

allow the court to exercise jurisdiction over them. *See id.* § 1351.  Here, there is no challenge to subject matter jurisdiction in light of the federal statutes invoked by Plaintiff in her FAC.

CASE NO. 18-CV-01681-GPC-BGS

reasonable." *Yamaha Motor Co.*, 851 F.3d at 1023 (alterations in original) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)). The burden is on the plaintiff to establish the first two prongs. *Axiom Foods*, 874 F.3d at 1068 (citing *Schwarzenegger*, 374 F.3d at 802). If the plaintiff satisfies the first two prongs then the defendant must present a "'compelling case' that exercise of jurisdiction would not be reasonable." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

Courts in this circuit apply the purposeful direction test to anti-trust complaints, *In re Capacitors Antitrust Litig.*, No. 14-cv-3264-JD, 2015 WL 3638551, at *2 (N.D. Cal. June 11, 2015); *Fleury v. Cartier Int'l*, No. C-05-4525 EMC, 2006 WL 2934089, at *2 (N.D. Cal. Oct. 13, 2006), and intentional tort cases, such as cases involving copyright infringement claims. *See Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 675 (9th Cir. 2012) ("We have characterized copyright infringement as a 'tort', and suggested that willful infringement is an intentional tort.") (quoting *Brayton Purcell*, 606 F.3d at 1128). Purposeful direction examines whether the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) which causes harm that the defendant knows is likely to be suffered in the forum state. *Axiom Foods*, 874 F.3d at 1069 (citing *Calder v. Jones*, 465 U.S. 783 (1984)).

Plaintiff has not met her burden of establishing that Tufts Medical Center purposefully directed any activities toward the State of California. Recall that the allegation upon which Plaintiff's specific jurisdiction arguments are founded is that Tufts Medical Center "received two sponsored research agreement payments from *California based* defendant Sorrento Therapeutics, Inc." as a result of the March 14,

CASE NO. 18-CV-01681-GPC-BGS

2016 Sponsored Research Agreement, and the January 27, 2017 Letter Agreement.[15] (ECF No. 69, at 18.)  Plaintiff further indicates that Tufts Medical Center and Dr. Junghans incorporated the results of the research agreements into Tufts Medical Center's provisional patent application—that is, the '825 priority data on second generation CEA CAR T cell constructs with YY1 or EZH2 knockdown.

Although there is no dispute that Tufts Medical Center committed an intentional act by contracting with SRNE, there is nothing presented by the record indicating that Tufts Medical Center expressly aimed any action toward California, or that it had caused harm likely to be suffered in that state.

Express aiming has not occurred here.  The fact that a defendant signs a contract with a corporation that is virtually at home in the forum state does not "automatically establish sufficient minimum contacts to support jurisdiction." *Selhorst v. Alward Fisheries, LLC*, Case No. 11–cv–3266 EMC, 2011 WL 4974568, at *4 (N.D. Cal. Oct. 19, 2011) (citing *Burger King Corp.*, 471 U.S. at 478 (1985)); *Senne v. Kansas City Royals Baseball Corp.*, 105 F. Supp. 3d 981, 1023 (N.D. Cal. 2015).  Indeed, courts have held that specific jurisdiction does not attach upon the receipt of money from a California-based corporation. *See IPS Shared Tech. Servs. Inc. v. Overwatch Systems, Ltd.*, No. C01401112 EMC, 2014 WL 2110341, at *3 (N.D. Cal. 2013).  Accordingly, it cannot be said that by effectuating two research agreements with SRNE, Tufts Medical Center expressly aimed any conduct toward the State of California.  This conclusion makes eminent sense, since the minimum contacts analysis concerns itself with "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285; *Burger King Corp.*, 471 U.S. at 478 ("If the question is whether an

---

[15] Plaintiff has also pointed to Tufts Medical Center's receipt in September 2015 of a letter from the Chan Soon-Shiong Family Foundation pledging a future gift of $2,000,000 to Tufts Medical Center.  It is alleged that Patrick Soon-Shiong is a "major SRNE investor and collaborator."  (ECF No. 3 at 11.)  However, the Court cannot discern any link between either Patrick Soon-Shiong or the Chan Soon-Shiong Family Foundation and California.

CASE NO. 18-CV-01681-GPC-BGS

individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.") (emphasis in original).

Moreover, to the extent it has been alleged that Tufts Medical Center should be haled into court in California because it filed a provisional patent using research derived as a result of the agreements with SRNE, it is not apparent what that allegation has to do with California. Assuming that the requisites of *Walden* are met, a plaintiff asserting copyright infringement may satisfy the express aiming requirement pursuant to the "individual targeting" theory. *Axiom Foods*, 874 F.3d at 1070. A theory of individualized targeting alleges that a defendant "'engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'" *A-Z Sporting Goods Inc.*, 704 F.3d at 675 (quoting *Dole Food*, 303 F.3d at 1111). The theory of individual targeting lends Plaintiff no relief, since she is not a resident of the State of California. As a result, Plaintiff has not established that Tufts Medical Center specifically directed any acts towards California in satisfaction of the second prong of purposeful direction analysis.

Relatedly, the third element—i.e., foreseeable harm in the forum state—is also lacking. "It is foreseeable that intentional infringement of a copyright will cause economic loss both in the forum where the infringement took place and where the copyright holder has a principal place of business." *Id.* at 679; *see also McGraw–Hill Cos. v. Ingenium Techs. Corp.*, 375 F.Supp.2d 252, 256 (S.D.N.Y. 2005) ("It is reasonably foreseeable that the provision of materials that infringe the copyrights and trademarks of a New York company will have consequences in New York . . . ."). So, while Tufts Medical Center might have anticipated an injury to arise in in Massachusetts (where the provisional patent application was filed) or in Ohio (where Plaintiff, as copyright holder, has her principal place of business), it would not have known that its actions would have consequences in California. *Cf. Panavision Int'l,*

*L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) ("Because the Indianapolis Colts used their trademarks in Indiana, any infringement of those marks would create an injury which would be felt mainly in Indiana . . . .").

Because Plaintiff has defaulted on her burden of establishing that Tufts Medical Center purposefully directed itself toward California, the Court must conclude it does not have specific jurisdiction over the Massachusetts-based entity.

### 3. Statutory Jurisdiction – Section 12 of the Clayton Act

Finally, the Court turns to Plaintiff's statutory personal jurisdiction claim. Plaintiff relies on Section 12 of the Clayton Act, 15 U.S.C. § 22, which provides nationwide personal jurisdiction for antitrust suits. However, since all of Plaintiff's antitrust claims have been dismissed, Section 12 cannot be invoked to hale Tufts Medical Center into court in California.

### C. Conclusion

The Court lacks personal jurisdiction over Tufts Medical Center both as a matter of California law and as a matter of federal statute. Accordingly, Tufts Medical Center's motion to dismiss is **granted.** However, because Plaintiff might be able to furnish arguments with respect to general jurisdiction upon amendment, and because the Court has granted leave to amend the antitrust claims upon which Plaintiff's Section 12 arguments depend, the dismissal shall be without prejudice.

### IV. Conclusion

In light of the foregoing, the Court **grants** both the Sorrento Defendants' motion to dismiss (ECF No. 18) as well as Tufts Medical Center's motion to dismiss (ECF No. 19). Notwithstanding dismissal, Plaintiff is granted leave to amend, in accordance with the Court's Order:

(1) her copyright infringement claims,

(2) her trade secret claims,

(3) her anti-trust claims, and

CASE NO. 18-CV-01681-GPC-BGS

(4) her pleadings with respect to personal jurisdiction over Tufts Medical Center.

However, any second amended complaint filed by Plaintiff may not:

(1) name the Board of Directors of SRNE, as a defendant or

(2) raise any further Fifth Amendment claims against the defendants in this action.

Plaintiff's motion for leave to amend is **denied** in part and **granted** in part consistent with the foregoing.  (ECF No. 46.)  Plaintiff is directed to file her Second Amended Complaint <u>no later than **March 13, 2019**</u>.  The motion hearing set for February 15, 2019 is hereby **VACATED.**

**IT IS SO ORDERED.**

Dated:  February 12, 2019

Hon. Gonzalo P. Curiel
United States District Judge

CASE NO. 18-CV-01681-GPC-BGS